Caroline Janzen, OSB #176233
caroline@ruggedlaw.com
JANZEN LEGAL SERVICES, LLC
4550 SW Hall Blvd
Beaverton, OR 97005
Phone: 503-520-9900
Pro Hac Vice

John Cochrane
johnpplllc@gmail.com
Pacific Property Law LLC
1367 North Falcon Drive
Ridgefield, WA 98642
Local Counsel

Of Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

SEATTLE DIVISION

| | |
|---|---|
| QUINTE HARRIS, an Individual, | Case No. |
| Plaintiff, | COMPLAINT (**Employment Discrimination, Wrongful Termination, Negligent Supervision**) |
| v. | |
| SKANSKA, BALFOUR BEATTY JV, MICROSOFT CORPORATION, and BALFOUR BEATTY CONSTRUCTION, corporations, | Filing Fee: $594 |
| | NOT SUBJECT TO MANDATORY ARBITRATION |
| Defendants. | JURY TRIAL REQUESTED |

COMES NOW, Quinte Harris, through undersigned counsel, to file this Complaint for Damages against the above-named Defendants. In support of his claims, Mr. Harris alleges as

follows:

## INTRODUCTION

This case centers on the pervasive and pernicious racial harassment and discrimination suffered by Quinte Harris at the hands of the Defendant corporations and their agents from May of 2021 until January of 2022. Mr. Harris is a proud and patriotic man who believes in working hard and pulling oneself up by the bootstraps, something he has done his entire life. Mr. Harris also believes in fairness and believed, prior to the events described in this Complaint, that the companies he worked with also valued conscientious work, as well as fairness. Tragically, Mr. Harris's belief that he would be treated fairly and justly in the workplace was destroyed by the heinous and unlawful acts of the Defendants (among the most influential companies in the United States) and their agents. This lawsuit is intended to restore Mr. Harris's faith that the America he loves is one that forcefully and unequivocally rejects racism in every form.

## JURISDICTION, VENUE, AND PARTIES

1.

Venue for this action is proper in the Western Washington District for the United States District Court, Seattle Division, where the cause of action arose, and where Defendants conducted regular, sustained business activity. Plaintiff is also a resident of Washington State.

2.

At all material times, Plaintiff Quinte Harris was a resident of Washington State.

3.

At all material times, the collective Defendants were licensed to do business in Washington State.

4.

At all material times, Mr. Harris was supervised by and subject to the Defendants' employees and/or agents and Plaintiff relied on the actual or apparent authority of the Defendants' employees, supervisors, and members of the management teams for each

corporation.

5.

Mr. Harris seeks a jury trial for all claims that can be tried to a jury under Washington State or federal law. Plaintiff has properly exhausted his administrative remedies through the Seattle branch of the U.S. Equal Employment Opportunities Commission and has filed this Complaint in a timely manner.

6.

## STATEMENT OF RELEVANT FACTS

Mr. Harris is a 47-year-old African American man. He is a father; he is a grandfather; he is a husband; he is a patriot; he is a Christian; he is a mentor; he is a member of his community who contributes deeply and profoundly to his colleagues, neighbors, friends, and family. Mr. Harris is also a conscientious worker who has steadfastly and with determination climbed the ladder of his chosen career to become a highly sought-after, highly skilled journeyman laborer. Mr. Harris does not believe in shortcuts or handouts. Mr. Harris believes in fairness and that one deserves the fruits of honest, diligent work.

7.

Mr. Harris has worked as a highly skilled journeyman laborer for the last three years. Prior to becoming a classified journeyman laborer, Mr. Harris worked as a traffic controller from 2015 until 2019. Construction traffic controllers direct the flow of vehicles to protect both construction drivers and laypeople drivers. It is a detail-oriented job requiring focus, determination, patience, and an intimate knowledge of the construction site. Mr. Harris worked in this position without incident and to favorable reviews for nearly five years. In fact, as a consequence of his hard work, good reputation, and superior skills, he was admitted as a journeyman when he joined the Laborer's Union in 2019 because he was credited for his work as a traffic controller.

8.

Mr. Harris has worked hard to hone his skills as a laborer and was rewarded by being hired onto increasingly complicated and favorable job sites. For example, in 2019, when Mr. Harris had first joined the Laborer's Union, he was hired on to work at the Microsoft Redmond campus modernization construction site, the location of the events described in this Complaint. This was a highly sought-after position because of the duration of the project (now in year three) and the prestige of the companies working on the construction site.

9.

As a journeyman laborer, Mr. Harris often works in a supporting role to other skilled professionals on construction sites. For example, because of his tireless work ethic and construction knowledge from his work as a traffic controller and laborer, Mr. Harris has collaborated closely with carpenters, masons, and operators. These symbiotic relationships allow for each individual to maximize their productivity and efficiency. Mr. Harris has been proud of his work in tandem with these other trained professionals.

10.

At the time Mr. Harris was assigned by the Union to work at the Microsoft Redmond campus modernization project in April of 2021, Mr. Harris was on the path to being promoted to a foreman position. Foreman positions are coveted positions. Foremen are responsible for scheduling, coordinating, and supervising the work of on-site operatives. Foremen must focus on the safety of his or her supervisees, as well as keep a focus on completing the work on time and on budget.

11.

Mr. Harris was ideally suited to becoming a foreman. Mr. Harris has the gravitas, the maturity, and the experience to be a foreman. He has been a natural leader and mentor to other operatives in the Union and on his job sites. In particular, Mr. Harris has enjoyed mentoring other African American operatives, who are still underrepresented as a group in the world of skilled laborers and other professionals on construction job sites.

12.

In April of 2021, Mr. Harris was hired on to the Microsoft Redman campus modernization construction site, a multi-year, multi-billion-dollar project involving dozens of construction companies, thousands of construction operatives, and miles of job site. It is not an exaggeration to state that the Microsoft Redman campus project is one of the largest construction job sites in the country. Moreover, upon information and belief, Microsoft, as the owner of the campus, was intricately and intimately involved in its progress and the culture of the work site. It is also a highly coveted assignment because of its longevity as a work site and its prestige. As stated above, Mr. Harris had been briefly assigned to the project in 2019 and was eager and excited to resume work there in 2021.

13.

At the time Mr. Harris resumed work at the Microsoft campus, he was hired directly through a joint venture between Balfour Beatty Construction and Skanska USA Building, Inc., two of the large contractors working on the job site. Mr. Harris was in an enviable position. He was a skilled laborer assigned to collaborate with the carpenters. He had been notified via email by his foreman that he could expect to be promoted to a foreman position in the summer or fall of 2021.

14.

Mr. Harris began working on the Microsoft campus project nearly a year after the horrifying murder of George Floyd at the hands of police officers in Minneapolis, Minnesota. George Floyd's murder and the graphic videos showing it second-by-second proved to be cultural and political flashpoints in the United States and reignited long-simmering tensions regarding race, policing, and the justice system. Those tensions reached their apex in the summer of 2020, resulting in mass protests around the world, some of which descended into chaos and, on rare occasions, even violence.

15.

Mr. Harris has always been supportive of law enforcement. Mr. Harris has also been aware of the tensions surrounding between racial politics in this country. Indeed, Mr. Harris has always been one of few African Americans working on construction sites. But for Mr. Harris, this fact historically had not been a source of resentment or fear; instead, it had caused him to redouble his efforts to prove that he, along with his fellow African American laborers, were equal to the positions they held.

16.

When Mr. Harris started work at the Microsoft project, he intuited, for the first time in his career in construction, the existence of undercurrents of stress and tension for many of the workers. Mr. Harris initially was unclear what was causing this palpable feeling of unrest. Unfortunately, he too soon became aware of the cause of the simmering tension.

17.

Over the course of the first month Mr. Harris worked on the Microsoft job site, he became aware of racial hostility from certain white construction operatives. Mr. Harris was surprised and chagrined by this development; although he has witnessed and even experienced racism over the course of his life, he had not experienced overt racism while working as a traffic controller or skilled laborer. Indeed, in general his time on construction sites more often than not had been marked by collegiality and fellowship.

18.

On or about May 12, 2021, Mr. Harris's expectations of a race-neutral environment came crashing down upon him and a nightmare-scape of pervasive racial hostility and discrimination began. On that day, another construction operative, John Patser, without warning or invitation, marched up to Mr. Harris and informed him that he, Patser, did not like the "Black Lives Matter" movement. He further informed Mr. Harris that he, Patser, did not care for Black people in general, especially if they were "from the South" and that he was not the only White man on the job site who held those views. Patser also informed Mr. Harris that if he, Mr. Harris, or any

other African American operatives complained about Patser's racism, Mr. Harris's employment, not Patser's, would be in jeopardy.

19.

Mr. Harris was horrified and angered by Patser's overt racism. Additionally puzzling to Mr. Harris was that it was entirely unprovoked; Mr. Harris had not been discussing the Black Lives Matter movement, the protests of the year before, or anything related to racial politics. Thus, Patser's confrontation was based solely on Mr. Harris's skin color and was intended solely to make Mr. Harris feel threatened, off-kilter, and unwelcomed.

20.

The Defendant corporations have all consistently made public and private statements committing themselves to a racism-free workspace and environment. Mr. Harris took them at their word. Despite his shock at Patser's hostility and aggression, Mr. Harris believed that (1) Patser's actions would be an isolated incident; and (2) once he reported this troubling and overt racism, the Defendants would ensure his safety and the safety of other African American operatives by terminating Patser.

21.

But Mr. Harris's hopes were quickly dashed. Mr. Harris went through the chain of command he understood to be the procedure for exposing racism or other types of discrimination. Mr. Harris reported the incident to his foreman, Josh Schley, who claimed he would report the incident to Jason Cornish, the general foreman for Mr. Harris's workspace. Mr. Harris continued to have a good faith belief that this escalation of the report would resolve the matter; however, this proved to be untrue. Instead, nothing was done to sanction Patser or to establish for other employees that Mr. Harris was in the right and Patser's actions were unacceptable.

22.

Instead of solving the racism Mr. Harris was subjected to, Mr. Harris's reporting led to

further racial discrimination and harassment. A series of events occurred after he first reported Patser's overt acts of racism.

23.

For example, shortly after Patser's attack on Mr. Harris and after an unrelated "Safe from Hate" initiative training, where the operatives learned about "safe spaces" among other language, Mr. Harris returned to his work cart to find a homemade cardboard sign with the handwritten, anonymous message "THIS IS NOT A SAFE SPACE" scrawled on it. In the context of the "Safe from Hate" training, the only reasonable interpretation Mr. Harris could take from this anonymous message was that he, Mr. Harris, as an African American man, was not safe from racial hatred at the workplace. Again, Mr. Harris had had no conversations with anyone before, during, or after the training about "safe spaces," so the impetuous for the sign could only be Mr. Harris's skin color.

24.

Mr. Harris began to observe that he was the target of increasingly hostile attacks and unequal treatment from White operatives and supervisors. Despite no change in his excellent work ethic and work product, he was increasingly passed over for his normal work and instead assigned to less favorable jobs, such as cleaning curbs. On more than one occasion, Mr. Harris's tools went missing, only to show up without explanation sometime later.

25.

Moreover, Josh Schley, his supervisor, stopped having any productive communication with Mr. Harris. This was retaliation for Mr. Harris continuing to report the harassment and unequal treatment he was being subjected to based on his race. Jake Schley, Josh Schley's brother and another supervisor on Mr. Harris's crew, made the retaliation clear when, on July 15, 2021, he told Mr. Harris in no-uncertain-terms that if Mr. Harris did not stop complaining about racism, he would be fired. Schley reiterated this threatening message on July 1, 2021, and again on July 19, 2021, when he tried to fire Mr. Harris.

26.

When Mr. Harris reported this racism and retaliation, he was reassigned to another crew on July 20, 2021, without being given the proper tools to complete his work effectively. This was another example of direct retaliation for speaking out against racial harassment and discrimination. The intent of his supervisors is further evidenced by Jake Schley's Facebook page, which included reference to him holding a mocking "White Privilege Card."

27.

Despite Schley's threats and despite being subjected to unlawful and profoundly damaging retaliation, Mr. Harris had to continue reporting the racism he experienced, both as a moral and professional imperative. Moreover, Mr. Harris became aware of other African Americans experiencing similar types of racist attacks on the job site and felt compelled to continue to speak out about his experiences in an effort to improve their work conditions, too.

28.

Throughout the remainder of July, into August, and September 2021, Mr. Harris experienced interference with his work, taunting, and harassment from White coworkers.

29.

When Mr. Harris first complained about the racial harassment and discrimination he experienced, the Human Resources apparatchik for Balfour Beatty assured Mr. Harris that the companies would address the racism he was experiencing and would protect him from retaliation. Over time, however, Mr. Harris observed that the Human Resources personnel became noticeably more aloof toward him, to the point where they appeared to be diminishing or minimizing his experiences in an effort to gaslight him into believing that he was not experiencing racism.

30.

From May until October 2021, the racial harassment, discrimination, and retaliation Mr. Harris experienced had a profound and deleterious effect on his physical and mental health. Mr.

Harris is a serious man, but a person who enjoys life. Those closest to Mr. Harris—his religious leaders, his mentors, and his wife—noticed that Mr. Harris was becoming depressed, anxious, and deeply stressed by his work environment.

31.

Finally, after receiving no assistance from the various companies at the Microsoft work site, Mr. Harris took it into his own hands to expose the racism he was subjected to and witnesses to the sanitizing force of sunlight. To that end, Mr. Harris sat down for a comprehensive interview with a local journalist that air on or about October 22, 2021, to explain what he had gone through at the Microsoft campus up to that point. Mr. Harris did so, not for fame or glory, but with a desperate hope that the "higher ups" for the Defendant companies would intervene and alleviate the suffering Mr. Harris and his other African American colleagues were experiencing.

32.

But Mr. Harris's hopes were further dashed. Instead of relief, he faced ever more vociferous and aggressive attacks and retaliation.

33.

For example, on October 26, 2021, his first working day after the KIRO news story aired, a worker named Craig Beavers approached Mr. Harris and yelled at him that he was walking on the wrong side of the road. Notably, several White men were behind Mr. Harris and Beavers did not attack them for walking on the same side of the road as Mr. Harris. Mr. Harris confronted Beavers about why he was not addressing the White men but did not receive a response.

34.

On November 8, 2021, Jake Schley drove a side-by-side recreation vehicle in the parking garage inches away from Mr. Harris, following Mr. Harris and giving him a threatening, confrontational stare. Mr. Harris felt menaced and reported Schley's conduct, to no avail.

35.

During this period, Mr. Harris's new supervisor, Robert Plumb, informed Mr. Harris that he was no longer in the running for a promotion to foreman. Mr. Harris was given no explanation for this that made any sense, given that his work quality had not been reduced through any fault of his own. Plumb also continued the steady, pervasive harassment that had become Mr. Harris's daily grind; Plumb would switch Mr. Harris's schedule without warning, would gaslight him, and would intentionally minimize the racial harassment and discrimination Mr. Harris was experiencing.

36.

Mr. Harris's work conditions continued to deteriorate as the year progressed. For example, on or about November 18, 2021, Mr. Harris was assaulted by an iron worker. On that day, Mr. Harris came to the defense of his apprentice, who was being verbally assaulted and falsely accused of theft by the iron worker. When Mr. Harris attempted peacefully to intervene and deescalate the situation, the iron worker laid his hands on Mr. Harris in an assaultive manner. Mr. Harris was understandably shocked by the incident and promptly reported it. After the incident, Mr. Harris experienced a series of escalating retaliatory actions, including the following:

- A paycheck of Mr. Harris's was shorted without good cause (before it was corrected) and he was given contradictory reasons for why that occurred.
- Mr. Harris's gang box was moved over to the laborers lay down without his consent and for the first time since he began working on the job site.
- This occurred a month after Robert Plumb, Mr. Harris's supervisor, told him that he would not be moved, and that Mr. Harris would stay with the carpenters as a carpenter tender. Mr. Harris was also told that he was not moved after bringing a complaint against the employee that used explicitly racist language against Mr. Harris.

- Mr. Plumb also blew up at Mr. Harris on the phone and hung up on Mr. Harris. Mr. Plumb then required that Mr. Harris submit to a "randomized" urinalysis (UA) test. When Mr. Plumb ordered Mr. Harris to take the UA, he said to Mr. Harris that he had "won the lottery" in a way that made Mr. Harris believe it was not randomized. Mr. Harris passed the UA, but upon information and belief, Mr. Harris was targeted in a retaliatory manner.
- Mr. Harris was reassigned to work on weekends after these events, an unfavorable assignment that interfered with his homelife.
- • Mr. Harris's tool cart went missing on December 15, 2021. He notified Mr. Plumb immediately about it, but Mr. Plumb tried to minimize its importance. It was "discovered" the next day and Mr. Harris was gaslighted into feeling it was all in his head, even though no good explanation was offered for why the tool cart went missing.
- After Mr. Harris's tool cart disappeared, he was upset and disturbed by the incident. Accordingly, he left work after notifying Mr. Plumb that he needed to take care of his mental health. Mr. Plumb responded that because Mr. Harris took Friday off, he would not get to work the overtime shift on the following Saturday, in an intentionally and unnecessarily retaliatory action.

37.

When Mr. Harris complained of these incidents, Mr. Plumb told him that, in essence, Mr. Harris was imagining racism and retaliation. This continuous gaslighting only worsened the impact of these events on Mr. Harris's mental health.

38.

Finally, on or about January 7, 2022, after suffering through months of intolerable conditions, Mr. Harris was terminated from his job. He left the Microsoft Redman campus a changed man; he was hollowed out by the pervasive racism he experienced, traumatized by the

overt threats to his wellbeing and the constant gaslighting the Defendants subjected him to, and he was mentally and physically wasted by the avalanche of racial harassment and discrimination that buried him.

39.

Upon information and belief, none of the Defendant corporations took appropriate ameliorative action to improve Mr. Harris's workplace conditions. The Defendants instead attempted to sweep under the rug Mr. Harris's well-founded and well-documented reports of racism. When Mr. Harris went public with his experiences in an effort to blow the whistle on the Defendants' unlawful conduct, the Defendants ruthlessly retaliated against him in an effort to force him out of the workplace. When that did not work, he was terminated without cause.

40.

The Defendants' actions have caused serious, profound, and permanent damage to Mr. Harris's career and wellbeing. As a consequence of the Defendants' tolerance for racism and retaliation against Mr. Harris, Mr. Harris's once-promising professional trajectory has been stymied. Extrapolated into the future, this lasting damage to his career is equal to millions of dollars that Mr. Harris is unlikely to realize now.

41.

Mr. Harris has also suffered significant and permanent damage to his emotional, spiritual, mental, and physical health. He suffers from symptoms consistent with post-traumatic stress disorder from the verbal and physical menacing he was subjected to on a regular basis. He is fearful for the first time in his life. The stress and deleterious impact these events have had on his life have strained virtually every close relationship. Those most knowledgeable of Mr. Harris as a person report that he is a changed man whose once joyful spark has been extinguished because of the agonizing and traumatizing events described in this Complaint.

42.

**LEGAL CLAIMS FOR RELIEF**

43.

## FIRST CLAIM FOR RELIEF

**(Unlawful Employment Discrimination Because of Race and Color – RCW Section 49.60.180 - Unfair practices of employers)**

44.

Plaintiff realleges all paragraphs above and below as if fully set forth herein.

45.

Plaintiff suffered unlawful discrimination by the Defendants and their agents as outlined *supra* in the preceding paragraphs. As a consequence of the unlawful discrimination by Defendants, Mr. Harris suffered a demotion in work duties, was denied a merit-based promotion, experienced pervasive harassment, and was terminated. The overwhelming motivation for these actions was Mr. Harris's race and color and retaliation for raising the discrimination he suffered.. Plaintiff seeks a jury trial for this claim.

46.

As a consequence of Defendants' violation of RCW 49.60.180, Plaintiff has been suffered significant economic and non-economic damages, including emotional distress in an amount to be determined at trial. Mr. Harris also seeks his costs and attorney's fees, as well as punitive/exemplary damages as permitted by law.

47.

## SECOND CLAIM FOR RELIEF

**(Unlawful Employment Discrimination in Violation of Title VII of the Civil Rights Act – 42 U.S.C. §2000e et seq)**

48.

Plaintiff realleges all paragraphs above and below as if fully set forth herein.

49.

Defendants breached Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.

§2000e-2(a)(1), by discharging Mr. Harris and otherwise to discriminating against Mr. Harris as described *supra* with respect to his workplace safety, promotional opportunities, job duties, compensation, and other terms of his employment, because of Mr. Harris's race and color. The Defendants' and their agents' unlawful conduct was motivated wholly or in part by racial animus and retaliation.

50.

As a result of Defendants' and their agents' unlawful conduct, Mr. Harris is entitled to damages for economic loss and non-economic damages in amounts to be determined at trial. Mr. Harris also seeks punitive/exemplary damages in an amount to deter the wanton and reckless conduct of the Defendants, in an amount to be determined at trial, but not less than sufficient to deter these corporations. Mr. Harris also seeks costs and attorney's fees and costs under 42 U.S. Code § 1988(b).

51.

**THIRD CLAIM FOR RELIEF**

**(Unlawful Retaliation in Violation of Title VII of the Civil Rights Act –**

**42 U.S.C. §2000e et seq)**

52.

Plaintiff realleges all paragraphs above and below as if fully set forth herein.

53.

Defendants breached Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2(a)(1), by retaliating against Mr. Harris when Mr. Harris engaged in protected activity with regard to the unlawful discrimination he was subjected to, and otherwise vocally and publicly opposed the unlawful racial discrimination and harassment he was subjected to by the Defendants and their agents.

54.

Mr. Harris suffered materially adverse actions by the Defendants after he reported and

made public his objection to and concerns about the racial harassment and discrimination he experienced by the Defendants' agents. This included Mr. Harris being threatened, physically assaulted, losing promotional opportunities, being demoted in job duties, and being terminated.

55.

As a result of Defendants' and their agents' unlawful retaliatory conduct, Mr. Harris is entitled to damages for economic loss and non-economic damages in amounts to be determined at trial. Mr. Harris also seeks punitive/exemplary damages in an amount to deter the wanton and reckless conduct of the Defendants, in an amount to be determined at trial, but not less than sufficient to deter these corporations. Mr. Harris also seeks costs and attorney's fees and costs under 42 U.S. Code § 1988(b).

56.

**FOURTH CLAIM FOR RELIEF**

**(Common Law Wrongful Termination)**

57.

Plaintiff realleges all paragraphs above and below as if fully set forth herein.

58.

A clear public policy exists supporting individuals exposing pervasive workplace harassment and discrimination, particularly in the context of large-scale corporations who benefit significantly from public monies, tax benefits, and governmental contracts. In this case, Mr. Harris "blew the whistle" publicly and through the media on the extraordinary discrimination and harassment he and other African American workers experienced at the Microsoft Redmond campus modernization project. As a consequence, he was subjected to significant adverse employment actions and wrongfully terminated. There was no overriding justification for Mr. Harris's dismissal.

59.

Janzen Legal Services, LLC
4550 SW Hall Blvd
Beaverton, Oregon 97005
Office: 503-520-9900; Fax: 503-479-7999

As a result of Defendants' wrongful discharge, Mr. Harris has suffered economic and non-economic damages in an amount to be determined at trial.

60.

### FIFTH CLAIM FOR RELIEF

**(Negligent Supervision)**

61.

Plaintiff realleges all paragraphs above and below as if fully set forth herein.

62.

Each of the Defendants were negligent in their supervision of their agents by allowing their agents to engage in overt and pervasive racial harassment and discrimination against Mr. Harris.

63.

As a direct and proximate cause of the Defendants' negligence, Mr. Harris suffered economic and non-economic damages in an amount to be determined at trial.

64.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Quinte Harris demands judgment against each Defendant for each claim and seeks the following relief:

1. A judgment in favor of Plaintiff and against Defendants in an amount to be determined at trial for Plaintiff's first claim for relief.
2. A judgment in favor of Plaintiff and against Defendants in an amount to be determined at trial for Plaintiff's second claim for relief.
3. A judgment in favor of Plaintiff and against Defendants in an amount to be determined at trial for Plaintiff's third claim for relief.
4. A judgment in favor of Plaintiff and against Defendants in an amount to be determined at trial for Plaintiff's fourth claim for relief.

5. A judgment in favor of Plaintiff and against Defendants in an amount to be determined at trial on Plaintiff's fifth claim for relief.

6. Plaintiff seeks a trial by a jury on all claims to which he is entitled to a jury trial.

7. Plaintiff seeks reasonable attorney fees, costs, disbursements, and prevailing party fees.

8. Such other relief as the Court deems just and equitable.

DATED this 25th day of April, 2022.

Respectfully submitted:

/s/John Cochrane
John Cochrane
johnpplllc@gmail.com
Pacific Property Law LLC
1367 North Falcon Drive
Ridgefield, WA 98642
Local Counsel

/s/Caroline Janzen
Caroline Janzen, OSB #176233
caroline@ruggedlaw.com
503-520-9900
JANZEN LEGAL SERVICES, LLC
4550 SW Hall Blvd
Beaverton, OR 97005
Phone: 503-520-9900
Pro Hac Vice

Of Attorneys for Plaintiff